IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| MARQUS PATTON, | |
| Petitioner, | **8:20CV504** |
| vs. | |
| | **MEMORANDUM AND ORDER** |
| TAGGART BOYD, Warden of the Reception and Treatment Center; MIKE HILGERS, Nebraska Attorney General; and ROB JEFFREYS, Director of the Nebraska Department of Correctional Services; | |
| Respondents. | |

This matter comes before the Court on Marqus Patton's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Filing No. 1.  In 2012, a jury convicted Patton in the District Court of Douglas County, Nebraska, of murder in the first degree and use of a deadly weapon to commit a felony.  He was sentenced to life imprisonment.  His conviction and sentence were affirmed by the Nebraska Supreme Court on direct appeal and on appeal from a motion for postconviction relief.  Patton seeks a writ of habeas corpus against Taggart Boyd, the warden of his facility of incarceration; Mike Hilgers, Nebraska Attorney General; and Rob Jeffreys, Director of the Nebraska Department of Correctional Services.  After an extended and careful review of the record, the Court finds no violation of Patton's constitution rights and thus denies his petition for writ of habeas corpus.

I.      BACKGROUND

A.  Factual Background

The parties do not dispute the following underlying facts as set forth by the Nebraska Supreme Court in its opinion addressing Patton's direct appeal:

On July 6, 2011, Patton was at the home of his friend Nicholas Ely.  Also present were Ryan Elseman and Emily G[usman, then] a juvenile.  The group decided to go swimming, and Drake Northrop arrived at around 11:45 a.m. to give them a ride.  After setting out in Northrop's vehicle, they decided to stop to buy marijuana from Kristopher Winters before going swimming.

Emily directed the group to Winters' home, where she had been before.  She testified that while they were in the car, she heard the others discussing a plan to rob Winters.  Northrop testified that it was Ely and Elseman who devised the plan to rob Winters and recalled them saying it would be an easy "lick," a slang term for robbery.  Northrop further testified that both he and Patton agreed with the plan.

Northrop parked the car around the corner from Winters' home.  Emily went to the door alone and agreed to send a text message to the others when she was inside.  While near Winters' home, Emily encountered Winters' friend Eric Brusha.  Brusha called Winters on his cell phone, and Winters let Emily and Brusha in the house.  Emily then sent a text message to Elseman stating that she was inside.

A few minutes later, Ely, Elseman, Patton, and Northrop entered Winters' home.  Elseman and Patton both carried firearms.  When Elseman held his weapon up, Winters rushed at Elseman.  Patton struck Winters as he fought with Elseman, and then Winters struck Patton with a chair.  Patton yelled for Elseman to shoot, and a gunshot struck Winters in the neck, causing his death.  As Winters fell, Ely, Elseman, Patton, and Northrop ran to the parked vehicle.  Emily was left behind.

Ely, Elseman, Patton, and Northrop left the scene in Northrop's vehicle.  Elseman sent Emily a text message instructing her to go to a nearby restaurant where someone would pick her up.  The others went to Patton's apartment.  On the way there, Patton stated that a bullet must have grazed him and showed the others a bloody injury on his stomach.  DNA testing later showed blood found in Northrop's car was a match for Patton.

Meanwhile, Brusha called the 911 emergency dispatch service and was present at the scene when investigators arrived.  An investigating officer escorted Brusha to the police station for an interview.  As they drove, Brusha saw Emily walking and identified her as a participant in the incident.  Emily was detained and taken to the police station.

Emily had blood spatters on her shirt, leg, and shoes.  She initially was uncooperative, but eventually told investigators what happened and showed them where Ely lived.  Patton was arrested on the morning of

2

July 8, 2011. Northrop was arrested on July 14. Northrop originally denied involvement, but eventually confessed and implicated Ely, Elseman, Patton, and Emily.

Patton, Emily, and Northrop were all charged with first degree murder. Emily and Northrop agreed to testify against Patton, and many of the facts summarized here came into evidence through their testimony. In addition, Cassandra Moyers, Winters' former girlfriend, testified that 2 days before the robbery, she had been at a party with Ely, Elseman, Patton, and Northrop. At that time, Patton asked Moyers to help him devise a plan to rob Winters, who was a known drug dealer.

*State v. Patton*, 845 N.W.2d 572, 576 (Neb. 2014).

At Patton's trial, both Drake Northrup and Emily Gusman testified. In addition to implicating Patton in the murder, Northrup and Gusman testified regarding their decision to testify against Patton. On direct examination, Gusman testified as follows:

Q. (By [the prosecutor,] Mr. Kuhse) What are you charged with, Miss Gusman?
A. I'm charged with first degree murder.
Q. And what do you hope happens with your case?
A. To get it dropped down to juvenile [court].
Q. All right. And have you been told that that is going to happen for sure?
A. No.

Filing No. 12-17 at 105–06.

On cross-examination, Patton's attorney delved deeper into the question of Gusman's cooperation:

Q. Now, you've – let's see, you were deposed by me back on May 31, 2012, correct?
A. Yes.
Q. And prior to that you had never spoke to the County Attorneys except on that day; is that right?
A. Yes.
Q. And you had already agreed to testify?
A. I believe so, yes.
Q. Well, you knew you were coming to a deposition on May 31, right?
A. Yes.
Q. So you had already agreed to testify against Marqus Patton, correct?
A. Yes.

3

Q. But you had never even spoken to the prosecutor?
A. No.
Q. So the information that you're getting about what these deals is or
aren't is [sic] coming from what source?
A. Will you ask the question again?
Q. Yes. You've testified about deals or possible deals.  Where are you
getting this information from?
A. There's no deal.
Q. Well, where are you getting these hopes (indicating) from?  Who's
communicating these to you?
A. My lawyer.
        . . . .
Q. (By Mr. Riley) And to save yourself, you have to cooperate with the
prosecutors, correct?
A. Um, yeah.
Q. Well, I mean, that's what you're doing here, correct?   You're
cooperating with the prosecutors, right?
A. Yeah.
Q. And if you didn't have any hopes -- and we'll get into that later.  If you
didn't have any hopes, you wouldn't be here testifying, would you?
A. Probably not, no.

*Id.* at 107–08, 127–33.

Patton's attorney also sought to elicit testimony from Gusman regarding the fact

she faced the possible penalty of life in prison due to being charged with first-degree

murder.  *Id.* at 169.  The court prohibited Patton's counsel from asking Gusman about the

specific penalty she faced because "whatever she's facing right now as far as a sentence,

Mr. Patton is facing."  *Id.* at 173.

Northrop likewise testified regarding his decision to testify.  On cross-examination,

Patton's attorney questioned Northrop about his cooperation:

Q. And that's what you're trying to do, isn't it --
A. No, sir.
Q. -- save yourself? Well, you're trying to save yourself, aren't you?
A. Yes, sir.
        . . . .
Q. And what is your understanding of what is going to happen?
A. Hopefully we get a deal.
        . . . .

4

Q. (By Mr. Riley) With regard to the deal-making process, have you been informed about any agreement or possible agreement in exchange for your testimony?
A. My attorney said that we are hoping to get a deal.
Q. What kind of deal?
A. I have no idea.
Q. Well, what kind of deal could you get?  Are you hoping you're going to walk out?
A. That would be awesome.
Q. I bet it would.  Yeah.  Is that what you think is going to happen?
A. No.
         . . . .
Q. Well, is [your attorney] making agreements or has he talked with the prosecutors and not told you about it?
A. Not that I'm aware of.
Q. Well, you would be pretty upset about that, wouldn't you?
A. Correct.
Q. You would want to know what -- whether he spoke with these two prosecutors or spoke with their boss --
A. Correct.
Q. -- about – wouldn't you?
A. Yes.
Q. Do you have any indication that any discussions took place?
A. Not that I'm aware of.

Filing No. 12-18 at 227, 256–58.

As he had done with Gusman, Patton's attorney sought to elicit testimony regarding the specific penalty Northrop faced should he be convicted of first-degree murder (i.e., life imprisonment).  *Id.* at 260.  The court again excluded the testimony on the basis that it would inform the jury of the penalty Patton himself faced since he and Northrop were both charged with the same crime.  *Id.* at 261.

Next, the sheriff's deputy who had interrogated Gusman, Dan Martin, testified at Patton's trial.  In discussing how Gusman finally confessed her involvement, Patton's attorney had the following exchange with Deputy Martin:

Q. And did you tell [Gusman] what the consequences would be if she was -- you know, if she was responsible for everything?
A. Yes.

5

Q. What did you tell her?
A. So that she could be arrested just like everyone else.  Life in prison.
Q. Life in prison.  So once you told her that she was facing that penalty, what did she do?
A. She told me another version of her story.

Filing No. 12-19 at 217.

The court declined to allow Patton's attorney to adduce evidence that Gusman and Northrop had entered into tacit plea agreements with the State.  Patton's attorney made an offer of proof that that if he were called, Gusman's attorney, Matthew Kahler, would testify as follows:

Q. All right.   Did the County Attorney's office leave you with the impression that they would find a way to get the case to juvenile court?

A. There's never been an express agreement that – or anything in writing or any deal that would lead to Emily going to juvenile court.  It's -- my client and I have an understanding that an expectation that, hopefully, she will end up in juvenile court based on her cooperation in this case and the -- including the initial interview she did, as well as testifying in these trials.

Q. Well, you indicated that you, to me yesterday, that your impression was that the County Attorney, upon the completion of all of her testimony, would find a way to get this into juvenile court, correct?

A. Well, what I have said is I have offered several ways for this to get up to juvenile court and different avenues to get there.  There's been no agreement on how that's going to be done.  I can't testify as to when or how that would be done.  But, again, I have an expectation that she will end up in juvenile court based on the conversations I've had.  Although there's nothing -- I can't tell the Court how that's going to happen.

Q. Well, you wanted to put it -- did you ask them to put it in writing?

A. I have not asked that, no.

Q. Did you ask them to make a formal agreement?

A. No.

Q. Why not?

A. Well, I told my client -- well, no – I'm sorry.

Q. We don't get there.

A. I'm sorry.  In a case, in a cooperation matter like this, it's my stand that at this point everything she does towards cooperation, at this point, can only help her.  I'm not - - she has, she has, again, cooperated since day one in this case, and this -- I haven't seen the need for an express agreement because I believe she's made a good case for herself to warrant her motion to transfer to juvenile court.

Q. So you're confident enough that she's going to juvenile court that you don't need an express agreement, is what you're saying, right?

A. Well, I typically wouldn't -- in state court, I wouldn't have a written agreement.

Q. Why?

A. Why?  I've never had a written agreement in a state court case that I can recall where someone's cooperating, a codefendant.  There may be some in other cases, but I've never had one. I've had them in federal court, but I don't have them in state court that I can recall.

Q. So how do you get an agreement from the prosecutors?

A. Well, usually, there's an understanding, either on the record or there's an understanding just in the conversations between the prosecutor and I, and that's something I can communicate to my client.

Q. Well, so there's kind of a tacit agreement?

A. At times, yes.

Q. Is that what we have here?

A. Well, this is a little different because, again, usually I would know -- I would be able to tell exactly what -- when I take something to my client, I can tell them, this is how this is going to happen, this is when it's going to happen.  Again, there have been no promises or actual agreements made in this case for how that's going to be done.

Q. But you're confident it will be done?

A. I am.

Filing No. 12-20 at 35–38.

The court permitted Patton's attorney to make an offer of proof that if he had been called, Northrop's attorney, Tom Olsen, "would say that early on in the case he spoke to Rob MacTaggart, who was initially the prosecutor involved in the case.  He got no specific agreement in writing or one that would be put on the record, only that it would be considered -- he would -- they would consider lesser offenses, depending on how things came out."  *Id.* at 67.

Following the offers of proof of Kahler and Olsen's testimony, the court again sustained the State's objection and excluded the proposed testimony.  *Id.* at 45, 76.  It concluded the proposed testimony was neither relevant nor valid impeachment because it did not establish the existence of any plea agreement and therefore did not contradict Gusman and Northrop's testimony.  *Id.* at 45, 76.

## B.  Procedural History

The jury found Patton guilty of murder in the first degree and use of a weapon to commit a felony.  Filing No. 12-10 at 60.  The state district court sentenced Patton to life imprisonment for first degree murder and a term of five to fifteen years for use of a weapon to commit a felony, the sentences to run consecutively.  *Id.* at 66.

Patton appealed his conviction.  Filing No. 12-1.  He argued, inter alia, that the trial court had violated his right to confront the witnesses against him when it limited his ability to cross-examine Northrup and Gusman about the penalty they faced should they be convicted; that the prosecution violated his right to due process by failing to disclose it had entered into tacit plea agreements with Northrup and Gusman in order to secure their

testimony; and the trial court deprived Patton of his due process rights by failing to admit evidence of Gusman and Northrop's tacit plea agreements. Filing No. 12-5 at 2.

The Nebraska Supreme Court affirmed Patton's convictions and sentences. *State v. Patton*, 845 N.W.2d 572, 576 (Neb. 2014). First, it concluded that Patton's confrontation rights had not been violated by the prohibition on inquiring into the penalty Gusman and Northrop faced. *Id*. at 580. It noted there was "authority in Nebraska for the general proposition that jurors need not and should not be told of the punishment faced by a defendant if convicted." *Id*. (citing *State v. Nelson*, 152 N.W.2d 10 (Neb. 1967)). While it concluded that this "this principle should yield to the right of a defendant to cross-examine a prosecution witness," it found that Patton was permitted to extensively and effectively cross-examine Gusman and Northrop about the benefit they hoped to obtain from testifying. *Id*. The Court also noted that the jury learned of the penalty Gusman faced from Deputy Martin's testimony when he testified he informed her she was facing life in prison during her interrogation. *Id.* at 581. It concluded,

> Because the jury learned of the penalty for first degree murder from another witness and because Emily and Northrop were cross-examined extensively on their motivation to obtain leniency from the prosecution by testifying, a reasonable jury would not have received a significantly different impression of the witnesses' credibility had defense counsel been permitted to ask what specific penalty Emily and Northrop faced. There was no violation of Patton's confrontation right.

*Id*.

As to Patton's argument that the trial court had violated his constitutional rights by failing to allow testimony that Gusman and Northrop had tacit plea agreements and that the State had failed to disclose such plea agreements in violation of *Brady*, the Nebraska Supreme Court concluded that "the evidence in this record does not establish the

existence of tacit plea agreements between the State and the two witnesses for the prosecution." *Id.* at 584.  It noted that although Gusman, Northrop, and their respective attorneys indicated they hoped to receive leniency in exchange for their testimony, they all testified they had not received any such promises from the State.  *Id.*  Finding no merit to the remainder of Patton's arguments not relevant here, the Nebraska Supreme Court affirmed Patton's convictions and sentences.  *Id.* at 585.

Patton then filed a motion for postconviction relief.  Filing No. 12-11 at 83–87.  In addition to the full record from his trial and direct appeal, Patton presented additional evidence regarding the supposed tacit plea agreement Northrop had with the State, including additional testimony from Northrop and Olsen, his attorney, as well as testimony from a jailhouse witness and the legal assistant who spoke to the jailhouse witness.  The additional testimony from Northrop dated to July 1, 2016, mere days before Northrop was to be released from prison after having his charge reduced to criminal conspiracy and being sentenced to ten years.  Filing No. 12-23 at 7.  Northrop again testified that he had not had a plea agreement at the time he testified against Patton:

> Q. All right.  Now what was your understanding of what consideration you
> would get in exchange for your cooperation on these multiple cases?
> A. I was hoping to get a deal.
> Q. What was your understanding?
> A. I didn't really have an understanding.  I trusted in my attorney.

*Id.* at 13.

Olsen, Northrop's attorney, testified that there was no written plea agreement between Northrop and the State.  *Id.* at 28.  Rather, he felt that cooperating was Northrop's "best course of action."  *Id.* at 30.  Then, "at some point it was determined that they [the prosecutors] were willing to do so, if he were to testify truthfully at trial . . . and after that

was completed, they would take that into consideration." *Id.* Olsen continued, "There was nothing set in concrete as to what he would get. It was that, at that time, if he testified truthfully and provided material information at trial, that they would take that into consideration in working with him and with the charge that he had." *Id.* at 31. When Patton's attorney pressed Olsen on why he would allow his client to incriminate himself by testifying without a plea agreement in place, Olsen responded as follows:

> And it's -- you're right, it is a leap of faith. It is. But in a situation where your client has two options, going to trial and facing life imprisonment on the charge on which he's already made a statement on and has basically kind of tied your hands, that in this instance, with, like I said, his level of culpability being the least amount, in my opinion, the fact that that he wasn't actually involved in the shooting, that I felt that he would be a good candidate to get a decent deal in the long run.

*Id.* at 53. Patton also produced Olsen's time sheet affidavit in support of his application for fees as court-appointed counsel which he indicated he had several lengthy discussions with the state prosecutors at various times before and after Patton's trial. Filing No. 12-24 at 1–4. The affidavit entries do not indicate what was discussed at these meetings.

Patton also presented the testimony of Justin Busch. Filing No. 12-23 at 55. Busch was incarcerated at the Douglas County Correction Center in October of 2011 (prior to Patton's trial) where he shared a cell with Northrop. *Id.* at 55–56. According to Busch, Northrop told him that he had reached a deal with prosecutors and "he was getting 10 to 20 or 10 to 15 or something like that." *Id.* at 60; Filing No. 12-24 at 29. Northrop also told Busch that he was not supposed to tell anybody about the deal. Filing No. 12-23 at 60. For his part, Northrop admitted sharing a cell with Busch but denied ever telling him he had a plea agreement. *Id.* at 15.

Lastly in support of his postconviction motion, Patton presented the evidence of Samantha Jordan.  Jordan was a trial assistant for the Douglas County Public Defender's Office who had had contact with Northrop on July 1, 2016, the day he testified at Patton's post-conviction hearing.  *Id.* at 72–73.  Jordan testified that after the hearing, Northrop called the public defender's office and said he wanted to speak with them.  *Id.* at 74. Jordan and an investigator spoke with Northrop at the jail.  *Id.*  The Court sustained the State's hearsay objection to Jordan's testimony as to what Northrop told her.  *Id.* at 75. Patton's attorney presented her testimony as an offer of proof that Northrop told Jordan that he had lied and that "[m]y attorney told me that he couldn't promise me that I had a deal but that I had a deal."  *Id.* at 76.  Jordan testified that she returned to the office and drafted an affidavit to that effect but that when she returned to the jail, Northrop refused to sign the affidavit because he feared being found in contempt of court.  *Id.* at 77; Filing No. 12-24 at 30–31 (unsigned copy of the affidavit).

The Douglas County district court denied Patton's motion for postconviction relief. Filing No. 12-11 at 101.  Patton appealed, *id.* at 103, and the State moved for summary affirmance, arguing Patton's claims were procedurally barred because they had been fully litigated on direct appeal.  Filing No. 12-8 at 4–5.  Patton argued the new material he presented at the evidentiary hearing regarding Northrop warranted the court's review. Filing No. 12-9 at 1–3. The Nebraska Supreme Court granted the State's motion for summary affirmance finding that the district court did not err in rejecting Patton's post-conviction motion.  Filing No. 12-4 at 1.

Subsequently, on December 9, 2020, Patton filed the filed present petition for relief under 28 U.S.C. § 2254.  The State moved for summary judgment, arguing the filing was

untimely.  Filing No. 7.  The Court denied the motion for summary judgment, finding the limitations period had been equitably tolled, Filing No. 11, and ordered the parties to brief the merits of the case.

## II.    ANALYSIS

Patton petitions for habeas corpus relief on three bases: 1) he was denied his right to confrontation under the Sixth and Fourteenth Amendments because he was precluded from presenting evidence to the jury that Gusman and Northrop faced the possibility of life in prison; 2) he was denied due process under the Fifth and Fourteenth Amendments because the State failed to disclose that it had entered into plea agreements with Northrop and Gusman; and 3) he was denied due process when the State failed to correct Northrop and Gusman's testimony that they had received no promise of consideration in exchange for testifying.  *See* Filing No. 1.  Additionally, Patton requests an evidentiary hearing, Filing No. 15, and the State asks the Court to reconsider its summary judgment ruling, Filing No. 14 at 6–9.

### A.  Legal Framework

When a state court has adjudicated a habeas petitioner's claim on the merits, there is a very limited and extremely deferential standard of review both as to the law and the facts.  *See* 28 U.S.C. § 2254(d).  Section 2254(d)(1) states that a federal court may grant a writ of habeas corpus if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1).  As explained by the Supreme Court in

*Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), a state court acts contrary to clearly established federal law if it applies a legal rule that contradicts the Supreme Court's prior holdings or if it reaches a different result from one of that Court's cases despite confronting indistinguishable facts.  A state court decision involves an "unreasonable application" when it identifies the correct legal rule, but unreasonably applies it to the facts.  *Id.* at 407. "A state court's application of clearly established federal law must be objectively unreasonable, not merely incorrect, to warrant the granting of a writ of habeas corpus." *Arnold v. Dormire*, 675 F.3d 1082, 1085 (8th Cir. 2012) (internal citations and quotation marks omitted).

As the Supreme Court noted, "[i]f this standard is difficult to meet, that is because it was meant to be." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011).  The deference due state court decisions "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Id.*  In short, "[i]t bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.*

**B. Application**

The parties appear to be in agreement that the state court addressed all of Patton's arguments on the merits and that the deferential standard set forth under 2254(d) therefore applies.  *See* Filing No. 23 at 23 (Petitioner's merits brief stating the Court should examine his claim under the two prongs of 28 U.S.C. § 2254(d), the subsection which requires the state court have "adjudicated [the claim] on the merits"); Filing No. 14 at 19, 25 (Respondents' brief agreeing the Court should employ the standard under § 2254(d)); *see Brown v. Luebbers*, 371 F.3d 458, 460 (8th Cir. 2004) ("[A]s the language

14

of the statute makes clear, there is a condition precedent that must be satisfied before we can apply the deferential AEDPA standard to [the petitioner's] claim.  The claim must have been 'adjudicated on the merits' in state court.").   The Court agrees.   The Nebraska Supreme Court rendered a decision on the merits when it determined that neither the prohibition on inquiry into penalties nor the alleged violations regarding the tacit plea agreements violated Patton's constitutional rights.   Accordingly, the Court can grant Patton's petition only if the state court acted unreasonably in either its application of established federal law or its determination of the facts.  *See* 28 U.S.C. § 2254(d)(1).

### C. Tolling

The State previously filed a motion for summary judgment on the basis that Patton's petition for relief under 28 U.S.C. § 2254 was not timely filed and the Court should not find the limitations period was tolled.   Filing No. 7; Filing No. 9 at 3–4.   The Court denied the State's motion for summary judgment, concluding that although Patton's petition was untimely, the limitations period was equitably tolled.   Filing No. 11 at 7.   The Court determined Patton's ability to timely file was impeded by the global Covid-19 pandemic and his inability to confer with his counsel due to pandemic restrictions.   *Id*. The Court noted Patton filed his petition within a reasonable time after the expiration of the limitations period, demonstrating diligence.   *Id*. at 8.   The Court also noted the length of Patton's sentence and the lengthy delay in the state court proceedings weighed in favor of addressing the merits of the petition.   *Id*.

The State asks the Court to reconsider its ruling finding the limitations period was tolled.   Filing No. 14 at 6–9.  It argues it did not know it could file a reply in support of its summary judgment motion and that it would have argued that Patton did not show the

requisite diligence or that extraordinary circumstances prevented his timely filing. *Id.* at 9. The Court does not find the State's additional arguments regarding tolling to be a persuasive reason to reconsider its prior ruling. Accordingly, the Court's prior conclusion that the limitations period was equitably tolled stands, and to the extent the State's brief on this matter is construed as a motion to consider, it is denied.

### D. Request for Hearing

Patton asks the Court to hold a hearing on his § 2254 petition. He argues he should be able to adduce the evidence the state court excluded from the prior proceedings: testimony from Northrup and Gusman's attorneys and Samantha Jordan's testimony regarding Northrup's supposed admission that he had plea agreement. Although the state court ultimately did not admit these pieces of evidence, it did accept Patton's offers of proof for these statements. Therefore, those items are already part of the record before the Court and a hearing is not necessary in order to have the Court consider them.

Additionally, where the state court adjudicated a habeas petitioner's claims on the merits, the federal court is limited to the record that was presented to the state court. *See Cullen v. Pinholster*, 563 U.S. 170, 185 (2011) ("[E]vidence introduced in federal court has no bearing on § 2254(d)(1) review. If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court."). Here, Patton concedes, and the Court agrees, that the Nebraska courts adjudicated all of his claims on the merits and his claims therefore fall under § 2254(d)(1). *See* Filing No. 23 at 23 (Petitioner's brief agreeing his

16

claims fall under § 2254(d)).   Accordingly, Patton may not introduce new evidence before this Court, and a hearing is therefore unnecessary.

### E.  Confrontation Clause Violation

Patton's first ground for relief is that he was denied his right to confront witnesses under the Sixth and Fourteenth Amendments to the U.S. Constitution because the trial court precluded him from presenting to the jury the fact that Gusman and Northrop faced the possibility of life in prison due to being charged with first-degree murder.  Filing No. 1 at 12.  The trial court reasoned that because this was the same charge Patton faced and because Nebraska law disfavors permitting the jury to know the penalty a criminal defendant faces, Patton should not be permitted to ask Gusman and Northrop about their potential sentences.   Patton argues the state court erred in prohibiting this cross-examination because the Supreme Court has repeatedly reaffirmed that state evidentiary or procedural rules must give way to an accused's rights.  Filing No. 23 at 12 (Petitioner's brief citing *Chambers v. Mississippi*, 410 US. 284 (1973); *Holmes v. South Carolina*, 547 U.S. 319 (2006); *Davis v. Alaska*, 415 U.S. 308 (1974), as examples where the Supreme Court prioritized defendants' rights over evidentiary or procedural rules).

The Sixth Amendment to the Constitution guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him."   U.S. Const. amend. VI.   This right is secured for defendants in state as well as federal criminal proceedings.  *Pointer v. Texas*, 380 U.S. 400 (1965).  Cross examination is the principal means by which the believability of a witness and the truth of his testimony are tested. *Davis v. Alaska*, 415 U.S. 308, 316 (1974).  Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross examiner

is not only permitted to delve into the witness's story to test the witness's perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness. *Id.*

"[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness." *Olden v. Kentucky*, 488 U.S. 227, 231 (1988) (internal citations and quotation marks omitted). However, "[a] limitation on cross-examination does not violate the Sixth Amendment unless the defendant shows that a reasonable jury might have received a significantly different impression of the witness's credibility had defense counsel been permitted to pursue his proposed line of cross-examination." *United States v. Dunn*, 723 F.3d 919, 934 (8th Cir. 2013) (quoting *United States v. Walley*, 567 F.3d 354, 358 (8th Cir. 2009)).

Here, even if the state court should have allowed its procedural rule prohibiting discussion of the defendant's penalty to give way to Patton's cross-examination, it did not violate Patton's Sixth Amendment rights. Patton was permitted to extensively cross-examine both witnesses about their motivations for testifying, including that they were both hoping to receive a reduction in charges and potential prison time. The comparatively minor restriction on inquiry into the exact penalty the witnesses faced did not prevent Patton from cross-examining Gusman and Northrop in order to show a "prototypical form of bias"—i.e., that they were seeking leniency by cooperating. *Olden*, 488 U.S. at 231. A reasonable jury would not have received a significantly different

impression of Gusman and Northrop's credibility had Patton's attorney been permitted to ask them about the penalty they faced. *See Dunn*, 723 F.3d at 934. Additionally, through Deputy Martin's testimony, the jury did become aware that Gusman, and consequently Northrop who faced the same charge, was looking at a life sentence. Thus, the Nebraska Supreme Court's determination that Patton's confrontation rights were not violated was not "contrary to, or involved an unreasonable application of, clearly established Federal law" nor was it "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1). Patton's petition for habeas-corpus relief on this basis is denied.

### F. Due Process Violations Regarding Tacit Plea Agreements

Patton's second and third grounds for relief center around his claim that Gusman and Northrop had tacit, undisclosed plea agreements with the State. First, Patton argues the State violated his Fifth and Fourteenth Due Process rights by failing to disclose the existence of the supposed plea agreements to him in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Filing No. 1 at 12–13. Second, Patton contends the State violated his Fourteenth Amendment Due Process rights when it failed to correct Gusman and Northrop's perjured testimony that they did not have plea agreements with the State. *Id.* at 13. The Court concludes that the state court did not make an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding" when it found that neither Gusman nor Northrop had a tacit plea agreement with the State.

The prosecution is required to disclose favorable evidence, including impeachment evidence such as a witness's motive to testify, to the accused. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 154 (1972). Along similar

lines, the State violates a defendant's due process rights when it fails to correct a witness's false testimony that he has received no consideration for his testifying against the defendant. *Napue v. Illinois*, 360 U.S. 264, 272 (1959).

Patton's due process arguments turn on his assertion that Gusman and Northrop had implicit plea agreements with the State at the time they testified at his trial. Patton points to several pieces of evidence in support of his argument that Gusman and Northrop had tacit plea agreements with the State: Gusman's attorney's testimony that he was "confident" her case would be transferred to juvenile court; testimony from Northrop's attorney, Olsen, that while there was nothing set in stone, the prosecutor said he would "take [Northrop testifying] into consideration in working him and with the charge that he had"; Olsen's fee affidavit showing he had multiple lengthy discussions with prosecutors before Patton's trial; and Busch's and Jordan's testimony that Northrop had told them he did, in fact, have a plea agreement with the State. Filing No. 23 at 15–20. The Court also notes that Northrop's attorney stated that while he had specific agreement, the prosecutor said, "if he were to testify truthfully at trial . . . and after that was completed, they would take that into consideration." Filing No. 12-23 at 30.

The Court is skeptical that there was no agreement between the State and Gusman and Northrop. The evidence points to the State purposely avoiding making express agreements while engaging in implied deal-making with the witnesses' attorneys. Both Northrop and Gusman's attorneys were confident that their clients would receive favorable consideration from the State for their testimony, indicating the State had conveyed its willingness to engage in tacit plea negotiating, whether in this case or by longstanding, unspoken practice. Such tacit plea-agreement making is deceptive and

doubly harmful to the defendant; not only can the State argue to the jury there was no quid pro quo for the witness's testimony, but the witness is also motivated to provide a maximally favorable version of the facts in order to obtain the best deal possible.  *See also* Bennett L. Gershman, *Litigating* Brady v. Maryland*: Games Prosecutors Play*, 57 Case W. Res. L. Rev. 531, 540 (2007) (discussing and condemning tacit plea agreements as "prosecutorial gamesmanship").

However, "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Cochran v. Dormire*, 701 F.3d 865, 869 (8th Cir. 2012) (citing *Wood v. Allen*, 558 U.S. 290 (2010)).  Here, there was conflicting evidence relating to the existence of plea agreements because both Gusman and Northrop repeatedly testified no agreement had been reached.  Despite this Court's belief that there was a tacit agreement, the state court's finding that neither Gusman nor Northrop had entered into tacit plea agreements with the State is not an "unreasonable determination of the facts," in light of the conflicting evidence that any agreement was at most, still being negotiated depending on the quality of the witness' testimony.  28 U.S.C. § 2254(d)(2).

Additionally, even if the State failed to disclose the tacit plea agreements, the Court cannot say that such a disclosure would have been material under *Brady* because there is not a reasonable probability that the result of the proceeding would have been different had the tacit plea agreements been disclosed.  *See United States v. Bagley*, 473 U.S. 667, 682 (1985) (*Brady* violation must "undermine confidence in the outcome" in order to be material).  The violation was not material because Patton's counsel was still permitted to extensively and aggressively cross-examine the witnesses on their motives to lie by

emphasizing that they were hoping for a favorable outcome by cooperating. The existence of a tacit plea agreement would not have significantly altered counsel's ability to cross-examine the witnesses regarding this motivation, although the jury would have been required to speculate about the exact degree of favorable treatment the witness would receive.

This is in contrast to cases in which the prosecution's failure to disclose a tacit agreement greatly impeded the defense's ability to impeach a witness's credibility. For example, in *Reutter v. Solem*, 888 F.2d 578, 582 (8th Cir. 1989), the prosecution failed to disclose that the key witness had his parole hearing postponed until after he testified at the defendant's trial. In closing, the prosecution argued to the jury that the witness "had no possible reason to be untruthful in his testimony because he already had been sentenced and therefore had 'nothing that he could gain' from cooperating with the state." *Id.* The Eighth Circuit called this "misleading and highly improper" and concluded there was a reasonable probability the outcome of the trial would have been different had defense counsel been told of the postponed parole hearing. Here, Patton's counsel was well aware of Gusman and Northrop's motivations to testify falsely and thoroughly and ably cross-examined them regarding the same.

Therefore, although the Court disagrees with the State court's determination that there were no implicit plea agreements, it cannot say that the State court's findings of fact or application of the law were unreasonable such as would require reversal of Patton's conviction under our extremely deferential standard of review. The Court cannot grant the habeas corpus relief Patton seeks.

### G. Certificate of Appealability

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the right to appeal the denial of a 28 U.S.C. § 2254 motion is governed by the certificate of appealability requirements codified at 28 U.S.C. § 2253(c). *Jones v. Delo*, 258 F.3d 893, 900–01 (8th Cir. 2001). The court may grant a certificate of appealability only where the movant "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The movant must show "the issues are debatable among reasonable jurists, a court could resolve the issues differently, or the issues deserve further proceedings." *Flieger v. Delo*, 16 F.3d 878, 882–83 (8th Cir. 1994) (citing *Lozada v. Deeds*, 498 U.S. 430, 432, (1991) (per curiam)); *see also Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000). A certificate of appealability must indicate which specific issue or issues satisfy the required showing. 28 U.S.C. § 2253(c)(3).

For the reasons discussed above, the Court finds reasonable jurists could debate whether tacit plea agreements existed and whether that should be a basis for granting habeas corpus relief. Accordingly, the Court grants Patton a certificate of appealability as to the denial of second and third causes of action, that he was denied due process under the Fifth and Fourteenth Amendments because the State failed to disclose that it had entered into plea agreements with Northrop and Gusman and that he was denied due process when the State failed to correct Northrop and Gusman's testimony that they had received no promise of consideration in exchange for testifying.

### III.     CONCLUSION

For the reasons stated herein, the Court denies Patton's habeas-corpus petition.

23

IT IS ORDERED:

1. Marqus Patton's petition for writ of habeas corpus, Filing No. 1, and request for an evidentiary hearing, Filing No. 15, are denied.

2. Patton is granted a certificate of appealability as to this second and third causes of action as set forth herein.

3. The Court will issue a separate judgment in conformity with this Memorandum and Order.

Dated this 22nd day of March, 2024.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge